IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MATTHEW TYLER,

      Plaintiff,

  v.              OPINION & ORDER

STEPHANIE WICK, DEBORAH MCCULLOCH,   14-cv-68-jdp
ROBERT KNEEPKENS, and WILLIAM PARKER,

      Defendants.

---

   Plaintiff Matthew Tyler, a person civilly committed to the Sand Ridge Secure Treatment Center under Wis. Stat. Chapter 980, brought this lawsuit alleging that various state officials violated his rights with regard to his probation revocation and several other issues during his placement at state facilities. In two previous orders, I dismissed the bulk of Tyler's claims on immunity grounds and other threshold issues. *See* Dkt. 89 and Dkt. 126. But in the latter order, I granted Tyler's motion to recognize that his complaint included due process claims against defendants Stephanie Lutz,[1] Robert Kneepkens, Deborah McCulloch, and William Parker for depriving him of his property and money when he was transferred from Sand Ridge to the custody of the Wisconsin Department of Corrections.[2] Dkt. 126, at 6-10. I gave the parties a chance to submit supplemental summary judgment briefing on

---

[1] In keeping with my previous orders, I will refer to defendant Stephanie Wick as "Agent Lutz" because Lutz was her surname during the events in question, the parties generally refer to her as such in their briefing, and there was another defendant with the surname Lutz.

[2] Because this case was removed by defendants, and Tyler is a civilly committed patient rather than a prisoner, there was no order screening the complaint under 28 U.S.C. §§ 1915 or 1915A, which would usually outline the claims present in the complaint.

these new claims. After considering the parties' supplemental briefing, I will grant summary judgment to defendants on these final claims and direct the clerk of court to close the case.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. To prevail on a § 1983 procedural due process claim, a plaintiff must demonstrate that he: (1) has a cognizable property interest; (2) has suffered a deprivation of that interest; and (3) was denied due process. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010). Tyler alleges that he was deprived of his property and money[3] in three ways:

- After he was transferred from Sand Ridge to the Milwaukee Secure Detention Facility (MSDF) on a probation hold (he was in this status from June 2 to October 26, 2011), his property and money were not transferred along with him.

- After his probation was revoked, he was incarcerated in Department of Corrections facilities[4] from October 26, 2011, to February 28, 2012, but he still did not receive any of his property or money.

- Tyler was transferred back to Sand Ridge on February 28, 2012, and he regained control over his money. But by then he had been forced to send his property from Sand Ridge to a family member. When the family member sent the property back to Sand Ridge, Tyler was not allowed to keep some of it, even though he says that the boxes were never opened on the outside. The property he was not allowed to have was eventually destroyed or donated.

As I stated in the previous summary judgment order, I take Tyler to be alleging that defendants were personally involved in these deprivations in the following ways:

---

[3] For the reminder of the opinion, unless it is necessary to distinguish between Tyler's property and his money, I will collectively refer to the property and money as his "property."

[4] From the parties' submissions it is unclear whether Tyler spent this whole time at MSDF or whether he was transferred to the Waupun Correctional Institution for part of the time, but this distinction is immaterial.

- Defendant Agent Lutz could have assisted Tyler with transfer of his property during the revocation hearing.

- In August 2011, defendant Kneepkens (the deputy director of the Sand Ridge facility) responded to a letter Tyler sent to McCulloch (the Sand Ridge director) about his property, by stating that the Sand Ridge "policy and practice" was to send a patient his property after the revocation hearing. Agent Lutz was copied on this email. Yet Tyler still did not receive his property upon revocation.

- On October 27, 2011, defendant Parker (who appears as a "property supervisor" on at least some of the documents submitted in this case) emailed Agent Lutz about Tyler's revocation and property. He stated in part that "[t]he past practice has been that the DOC will not accept any property from Sand Ridge in these situations." Dkt. 74-2, Exh. B43, at 294.

- On November 29, 2011, defendant Parker sent a letter to Tyler warning him that his property would be disposed of if he did not provide a forwarding address for his property.

- On December 1, 2011, a Sand Ridge staff member received an email from a MSDF social worker stating that Tyler was asking about his property. The staff member sent an email (to whom I understand to be another Sand Ridge staff member) requesting confirmation that Tyler had already received his property upon revocation. The response the staff member received was that defendant Parker and another captain "were working on this issue."

- In March 2012, Tyler filed a "patient request" form stating that he did not receive a copy of his property sheet detailing the checks in his possession, all of his legal work, and he asked to switch some of the clothes in his immediate possession with some of those in storage. Defendant Parker responded by stating that Tyler did in fact receive the items he said were missing and that his "request to review [his] storage bin will be honored according to the alphabetical schedule."

- Tyler filed two grievances about the problems with his property that were denied. Defendant McCulloch was one of the reviewers during the appellate process; she upheld the denial of both grievances.

3

Defendants contend that Tyler's claims should be dismissed for three reasons: (1) defendant McCulloch has absolute quasi-judicial immunity for her actions in reviewing Tyler's grievances; (2) defendants have qualified immunity regarding all of Tyler's individual capacity claims; and (3) sovereign immunity bars any official capacity claims.

## A. Absolute immunity

Defendants contend that defendant McCulloch has absolute immunity for her actions in denying Tyler's grievances about his property, on the theory that she was performing a quasi-judicial function in reviewing the grievances. *See* Dkt. 135, at 16-18 (citing *Laxton v. Watters*, 348 F. Supp. 2d 1024, 1029 (W.D. Wis. 2004) (dismissing claim against grievance examiner because "liability will not lie for acts of a quasi-judicial nature."); *Wilson v. Watters*, 348 F. Supp. 2d 1031, 1035 (W.D. Wis. 2004) (same). But this analysis has been abandoned by this court after it became clear that the Seventh Circuit does not invoke quasi-judicial immunity for prison officials reviewing inmate grievances. *See Lindell v. O'Donnell*, No. 05-C-04-C, 2005 WL 2740999, at *14 (W.D. Wis. Oct. 21, 2005) ("This court has held previously that persons making recommendations for the disposition of inmate complaints are entitled to absolute immunity for their recommendations and decisions. . . . However, in reconsidering the question in connection with this lawsuit, I have decided that the earlier holding cannot stand.") (citing *State v. Greeno*, 414 F.3d 645, 656 (7th Cir. 2005)). As the state should know from many cases litigated in the following years, grievance examiners cannot evade liability on absolute immunity grounds.

## B. Qualified immunity

Defendants also contend that they are entitled to qualified immunity for each of Tyler's due process claims. Qualified immunity protects government officials "from liability

4

for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In deciding whether a right is "clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The right must be established "at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013).

"To determine if the defendants are entitled to qualified immunity, [the court asks] two questions: (1) whether 'the facts alleged show the [official's] conduct violated a constitutional right,' and (2) whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).

Defendants contend in part that they did not violate a clearly established right because each of their decisions was made pursuant to Sand Ridge regulations. They say that defendant Kneepkens responded to Tyler's letter complaining about not receiving his property at MSDF prior to his revocation by telling him that it was Sand Ridge "policy and practice" to send a patient's property only after the revocation hearing. After Tyler was revoked, defendant Parker emailed Agent Lutz to tell her that "[t]he past practice has been that DOC will not accept any property from Sand Ridge in these situations." Dkt. 74-2, Exh. B43, at 294. Parker instead told Tyler to ship his property to someone on the outside, pursuant to Sand Ridge policy. Then, when Tyler returned to Sand Ridge, he was not allowed to have all of his old property that was shipped back, because defendants say that some of it violated Sand Ridge property policies.

5

I agree in theory with defendants that a state official would likely be entitled to qualified immunity where he or she acts pursuant to policies they reasonably believe to be constitutional. *See, e.g., Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("it was not unreasonable for law enforcement officers to look and rely on their formal ride-along policies" in determining whether it was constitutional to bring media into home during execution of warrant); *Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999) (customs inspector entitled to qualified immunity on strip search claim in part because she "was following Customs policy as she understood it."). But I conclude that defendants fail to show, at least at this point of the proceedings, that they indeed acted pursuant to state policies in withholding Tyler's property before revocation, after revocation, and after his return to Sand Ridge.

For instance, when defendant Kneepkens responded to Tyler's letter asking about his property following his transfer to MSDF for revocation proceedings, Kneepkens did not refer to a specific policy for his statement that it was Sand Ridge "policy and practice" to send a patient's property only after the revocation hearing. Defendants say that the following policy applied to Tyler's transfer to MSDF:

> When transfers to the Department of Corrections (DOC) or other agencies occur, the patient's property will be held at SRSTC for a maximum of 45 days from the date of the court order. During this period, the patient needs to identify an address where his property can be sent. If no address is provided, the property will be considered contraband and will be donated to charity and/or disposed of via contraband garbage.

Policy # SR 115 Procedure 12.F., Dkt. 51-1, at 10. Defendants argue that Kneepkens could not have known he was violating a clearly established right of Tyler's by enforcing this policy. Tyler responds that defendants do not identify the policy behind Kneepkens's letter, which is incorrect; defendants name Procedure 12.F. in their current briefing and in previous briefing.

But in Tyler's previous summary judgment briefing, he addressed defendants' invocation of Procedure 12.F. by saying that that procedure did not apply to his situation. Instead, he said that Procedure 12.E. applied to him. That procedure states:

> Patients may be transferred between facilities within the Department of Health Services, a jail or to Department of Corrections for short term stays. Short term stays are defined as less than one year. *Patients transferred under these circumstances will transfer with their allowable personal property within the limits of the receiving facility.* Patients may be allowed to store property that fits in one (1) storage bin (not to exceed 75 lbs) for up to one year at SRSTC. . . .

*Id*. at 9-10 (emphasis added).

Tyler also provides an affidavit of another prisoner, Lee Ratzel, who states that when he was transferred from Sand Ridge to MSDF, he received the money from his Sand Ridge account *before* he was revoked, and that Sand Ridge applied Procedure 12.E. by keeping his property rather than telling him that it needed to be sent to an outside contact. *See* Dkt. 152. It is unclear why Sand Ridge would have kept all of Ratzel's property when Procedure 12.E. says that patients transferring for short-term stays are transferred with allowable personal property. It is also unclear why Procedure 12.F. applied to Tyler's transfer to MSDF instead of Procedure 12.E. Thus Tyler has presented evidence raising a reasonable inference that it is *not* Sand Ridge policy to completely withhold a patient's money and property when he is transferred to a DOC facility awaiting revocation proceedings. Without further factual development about how these procedures are actually applied to patients who face revocation, I cannot say as a matter of law that Kneepkens is entitled to qualified immunity on the ground that he followed policies that he reasonably believed to have been constitutional.

Similarly, it is unclear whether, following Tyler's revocation, Parker was actually following Sand Ridge policy by forcing Tyler to ship all of his property to his nephew under Procedure 12.F. rather than send at least some of it to Tyler at MSDF and keep the rest of it at Sand Ridge under Procedure 12.E. In his email to Agent Lutz, Parker says that under "past practice," the DOC would not accept *any* property transferred over from MSDF. This implies that both Lutz and Parker had good reason for failing to send over any of Tyler's property even after revocation. But it is difficult to believe that this is truly the policy—Kneepkens says differently in his letter, Procedure 12.E. suggests that some property could be transferred, and the grievance examiner told Tyler that "[a]ctive legal work is accepted by DOC facilities if it is requested," Dkt. 51-B, at 28. Defendants also do not provide a policy supporting Parker's statement.

As for the rejection and destruction of property sent to Tyler's nephew and then sent back to Sand Ridge, I understand Tyler's frustration that his property was forced to be sent to his nephew, perhaps in violation of Procedure 12.E., and then that very same property, apparently previously allowed at Sand Ridge, was not fully accepted when it was sent back there. Of course, Sand Ridge officials do not have to believe that the property sent back truly was identical, untampered-with property, and it is possible that items Tyler was allowed to have at one point might not be allowed when later sent by a family member. But without further factual development, I cannot tell exactly how these procedures are applied, and thus whether defendants can shield themselves from liability by saying that they merely followed reasonable facility policy.

This leaves defendants' argument that they should be granted qualified immunity on the other prong of the analysis, that Tyler cannot prove that a constitutional violation

8

occurred. They contend that Tyler cannot prove his claims because, if their actions violated Sand Ridge property policies, the following deprivations were based on "'random and unauthorized' actions by state officials [that] do not give rise to federal procedural due process claims where state tort remedies are available." Dkt 135, at 27 (quoting this court's December 4, 2015, order, Dkt. 126, at 12, which in turn cited *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), and *Zinermon v. Burch*, 494 U.S. 113, 132 (1990)).

Although defendants cite my previous summary judgment order for this proposition, I followed the quoted language (in analyzing Tyler's malicious prosecution claim) by stating:

> I am not persuaded that the *Parratt* rationale cited in *Newsome* [*v. McCabe*, 256 F.3d 747 (7th Cir. 2001)] applies to the facts at hand in light of the Seventh Circuit's recent decision in *Armstrong v. Daily*, 786 F.3d 529, 541-46 (7th Cir. 2015), in which the court clarified that a plaintiff could maintain federal due process claims regarding the loss or destruction of exculpatory evidence in a criminal proceeding despite the availability of state tort claims. The *Armstrong* court explicitly noted that in *Newsome*, *Parratt* did not bar the claim that police officers had withheld exculpatory evidence from the prosecutor and defense. *See Armstrong*, 786 F.3d at 541 (discussing *Newsome*, 256 F.3d at 752). Ultimately, the *Armstrong* court concluded that actions of an overzealous prosecutor were not necessarily random and unauthorized, pre-deprivation process was not impractical (where the due process violations took place within the context of "the most elaborate pre-deprivation procedural protections known to American law: a criminal trial"), and that "[a]t the most fundamental level, it is an absurd notion" that there is no violation of a criminal defendant's constitutional right to due process where his trial is tainted by prosecutorial wrongdoing. 786 F.3d at 545-46.

Dkt. 126, at 12-13.

Defendants acknowledge *Armstrong*, but attempt to limit it to cases regarding the destruction of exculpatory evidence in an ongoing criminal proceeding. This is not quite

right. Although the *Armstrong* court did explain that *Parratt* had never been applied to

plaintiffs "seek[ing] to vindicate rights of fundamental fairness in criminal proceedings," 786

F.3d at 541, the court went on to explain that

> the *Parratt* doctrine responded to a practical problem in a
> narrow subset of procedural due process cases, where a plaintiff
> contends that the state must provide notice and a hearing before
> carrying out a deprivation of liberty or property, but where a
> pre-deprivation hearing simply is not practical. In both *Parratt*
> and *Hudson*, the plaintiffs complained they had been deprived of
> property with no process at all, so they sought to vindicate their
> right to notice and an opportunity to be heard through § 1983.
> The Court responded in *Parratt* with a special application of the
> *Mathews v. Eldridge* . . . balancing test: "*Parratt* and *Hudson*
> represent a special case of the general *Mathews v. Eldridge*
> analysis, in which postdeprivation tort remedies are all the
> process that is due, simply because they are the only remedies
> the State could be expected to provide." *Zinermon*, 494 U.S. at
> 128.

*Id*. at 544-45. In short, there is nothing restricting *Armstrong's* discussion of the limitations of

*Parratt* to deprivations in criminal cases.

Nonetheless, the facts alleged by Tyler in his complaint and developed at summary

judgment fit comfortably within well-worn precedent regarding deprivations of property by

institution officials. Courts have consistently held that due process claims for deprivation of

arrestee's or prisoner's property fail where the plaintiff has adequate postdeprivation

remedies. *See, e.g.*, *Davenport v. Giliberto*, 566 Fed. App'x 525, 529 (7th Cir. 2014) (negligent

loss of arrestee property did not offend due process, and would not even if intentional,

because state-law claim for conversion was available); *Munson v. Gaetz*, 673 F.3d 630, 638

(7th Cir. 2012) ("Munson's complaint also makes it clear that he received all the process he

was due in the form of a written notice explaining why he couldn't possess the books and a

meaningful chance to be heard by a series of prison officials."); *Stewart v. McGinnis*, 5 F.3d

1031, 1036-37 (7th Cir. 1993) (due process requires "a meaningful opportunity to be heard on" whether an item is contraband); *Jackson v. Raemisch*, No. 10-cv-212-slc, 2010 WL 3062971, at *8 (W.D. Wis. July 30, 2010) (prisoner is not entitled to procedure before his property is taken or destroyed, so long as a meaningful remedy exists postdeprivation.). I do not read *Armstrong* as changing course on this line of cases, which means that Tyler cannot prevail on his due process claims. Even beyond the administrative grievance process, he had or perhaps still has meaningful postdeprivation remedies. *See, e.g.*, Wis. Stat. §§ 51.61(7) (action for damages for violation of civilly committed patient's rights); 893.35 (action to recover personal property after wrongful taking, conversion, or wrongful detention), 893.51 (action for damages resulting from wrongful taking, conversion, or wrongful detention of personal property), and 893.52 (action for damages from injury to property); *Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996) (inmate complaint review system, certiorari review under Wisconsin law, and Wisconsin tort remedies against prison officials are adequate remedies for deprivation of good-time credits).

The only claim Tyler brings that could arguably fit within *Armstrong's* purview is his claim against defendant McCulloch, the Sand Ridge director, for her actions in reviewing his grievances upon his return to Sand Ridge. But he does not properly develop a theory that McCulloch limited his right to be heard or otherwise compromised the validity of the grievance process, which would make his claim at least somewhat similar to those discussed in *Armstrong*. *See Tonn v. Dittmann*, 607 F. App'x 589, 590 (7th Cir. 2015) (prisoner could maintain due process claim against examiner officials who sought restitution without presenting any evidence of the actual amount at stake at hearing). In his complaint, Tyler

stated that McCulloch "conspired" with the other defendants to deny him of property, but he never developed facts suggesting what that conspiracy might be.

In his supplemental proposed findings, Tyler says that McCulloch should have recused herself from the grievance process because "her actions and inaction were the subject of [his] grievances." Dkt. 150, at 10, ¶ 231. Having a biased decisionmaker on grievances could violate Tyler's due process rights, but he does not show that this is the case here. Tyler says that McCulloch's involvement in the previous deprivations stems from the fact that he wrote her the August 2011 letter mentioned above (and to which defendant Kneepkens responded), and from the nature of her job as director, because she was "in charge of assuring that Sand Ridge policies and procedure are implemented and Tyler's rights protected." *Id.*, at 10-11, ¶ 231. But there is no indication that McCulloch was personally involved in responding to Tyler's letter (as opposed to Kneepkens), and the mere fact of her position as director does not make her a biased decisionmaker on grievances involving her employees.

Because I conclude that Tyler cannot bring due process claims against any of the defendants in their individual capacities, I will grant defendants' motion for summary judgment on these claims.

## C. Official capacity claims

In his complaint, Tyler names each of the defendants in their official capacities. Defendants close their brief by suggesting that any such claims are barred by the doctrine of sovereign immunity. That doctrine is derived from the Eleventh Amendment and generally "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities," *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010), unless the state waives immunity, Congress abrogates it or the

claim falls under the exception articulated by the Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908). Under *Ex parte Young*, a plaintiff may file "suit [ ] against state officials seeking prospective equitable relief for ongoing violations of federal law . . . . " *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997).

In the first summary judgment order in this case, I stated that "[t]he only arguable claim for prospective relief relates to plaintiff's requests for his 12 boxes of property to be returned to him, by which I understand him to be saying that he wants the property with him at Sand Ridge instead of with his relative on the outside." Dkt. 89, at 24. But further factual development shows that there is no more property to return to Tyler: it either has already been returned to him, or it was long ago destroyed or donated. Tyler's official capacity claims will be dismissed along with his individual capacity claims.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 134, is GRANTED.

2.  This case is DISMISSED and the clerk of court is directed to close the case.

Entered September 29, 2016.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

13